

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AFM:RMP
F. #2022R00288

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 2, 2024

By ECF and E-Mail

The Honorable Joan M. Azrack
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

   Re: United States v. David Scotese
     Criminal Docket No. 23-231 (JMA)

Dear Judge Azrack:

   The government respectfully submits this letter in advance of the sentencing of the defendant David Scotese, which is scheduled for July 16, 2024 at 2:00 p.m. On March 13, 2024, the defendant pleaded guilty to Count One of the indictment, which charges him with operating an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960(a). The government submits that a sentence of imprisonment within the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 18 to 24 months, or a modest downward variance to reflect the defendant's efforts to cooperate with the government after his arrest, would be reasonable in this case.

   I. Background

   This case arises from the defendant's yearslong operation of an unlicensed money transmitting business, despite abundant warning that such operation was unlawful. See Presentence Investigation Report, dated June 11, 2024 ("PSR") ¶¶ 4–13.

   Sometime before January 2016, the defendant began operating his cryptocurrency exchange business. Id. ¶ 4. In sum, the defendant solicited customers online, id., sent them bitcoin and other cryptocurrencies (less a fee) in exchange for cash, and also hand-delivered or mailed cash (less a fee) in exchange for bitcoin and other cryptocurrencies. Id. ¶ 13. The defendant did not register with FinCEN or state authorities or otherwise comply with the "know your customer" and reporting requirements of anti-money laundering laws and regulations. Id. ¶ 7. This non-compliance made the defendant an attractive resource for narcotics traffickers. Indeed, although the defendant's online solicitations were, to the government's knowledge, all posted on public forums on the open internet, he was discussed by others on darkweb[1]

---

   [1] The darkweb is web content that exists on darknets—that is, on overlay networks within the internet that can only be accessed with specialized software. Darknets typically

marketplaces, where buyers and sellers of narcotics recommended the defendant to each other as a reliable means of anonymously converting cash to cryptocurrency and vice versa (by contrast, "establishment" cryptocurrency exchanges comply with anti-money laundering laws and are therefore less desirable to drug dealers, even when offering favorable exchange rates relative to the defendant and other illegal exchanges). Id. ¶ 8.

In at least one of the defendant's online solicitations, which was active until his arrest in this case, the defendant included detailed instructions for mailing bulk cash covertly. He wrote, "I recommend using a mylar bag to make it difficult for any scanner to tell postal employees that [the package] contains cash," and he included a link to the particular mylar bags on Amazon.com that he used himself. Id. ¶ 7. He added, "I usually divide the stack in half so I have two stacks of bills I can lay side by side . . . [with] a rubber band around them both . . . [to] hold them together in a squarish shape." That way, "[t]he bulge they make in the envelope looks like a square instead of the U.S. currency rectangle, and it feels like a small book instead of cash. The cash goes in the mylar, and the mylar gets taped shut and goes into the free USPS Priority or Priority Express envelope." Id.

The defendant was familiar with the risks of bulk-cash mailing. In January 2016, he conducted a transaction with a man in Georgia named Woodie Ochle. Id. ¶ 4. The defendant sent bitcoin to Ochle in Georgia and Ochle mailed $15,000 in cash to the defendant in California. Id. Ochle was at that time the subject of a narcotics trafficking investigation. Id. On January 13, 2016, the package of cash that Ochle had mailed to the defendant was removed from the stream of mail and detained by the U.S. Postal Inspection Service. Id. In April 2016, Ochle was arrested in Florida on charges of methamphetamine trafficking. Id. Ochle later pleaded guilty to federal MDMA trafficking charges in the Northern District of Alabama and was sentenced to 125 months of imprisonment. See United States v. Woodie Louis Ochle, 2:17-CR-112 (MHH) (SGC) (N.D. Ala.). On June 3, 2016, the U.S. Attorney's Office for the Central District of California filed a civil forfeiture complaint against the seized currency, alleging that it was traceable to the proceeds of narcotics trafficking. See United States v. $15,000 in U.S. Currency, 16-CV-1166 (C.D. Cal.).

Scotese filed a claim for that cash and represented himself pro se in the forfeiture action. PSR ¶ 5. In that litigation, Scotese affirmed that he owned a sole proprietorship in his own name, and he acknowledged having made the bitcoin-for-cash transaction with Ochle. Id. He also acknowledged making a public internet post in which he said "[d]ealing bitcoin supports my life and family" and "I started doing that almost three years ago, and I've never made more money any other way." Id. In response to the government's request for information reflecting registration of a bitcoin exchange business with FinCEN, Scotese affirmed "if I remember correctly, I have not made any such registration." Id. The government moved for summary judgment on the basis that the currency represented proceeds of the defendant's unlicensed money transmitting business, which he operated in violation of 18 U.S.C. § 1960, and the government also attached FinCEN guidance on the application of the Bank Secrecy Act and FinCEN regulations to virtual currencies, which was served on the defendant. Id. In March

---

implement encryption and traffic anonymization techniques to conceal the identity and location of users as well as the locations of servers.

2017, before the court ruled on the summary judgment motion, the defendant agreed to settle his claim for $3,750, and consented to the remaining $11,250 being forfeit to the government. Id.

Although the defendant was not criminally charged at that time, the civil forfeiture action clearly put him on notice that the government regarded his conduct as unlawful. Indeed, during and after that litigation, the defendant made relevant statements online, including in a public blog and "Bitcoin Dealer" email newsletter that he operated. Id. ¶ 6. In one such newsletter, the defendant wrote, "I am accused of running an 'Unlicensed Money Transmitting Business.' I have been considering getting a license. However, until the judge . . . confirms that I have broken the law, I think it would be premature." Id. In a subsequent newsletter, he wrote, "I have to stop doing anything that might look like 'engaging in the business of currency exchange,'" citing the forfeiture action, and he added, "I decided to offer my services as a tutor so that I can help you find ways to get bitcoin without the risk of breaking the law as [the government attorney in the forfeiture action] suggested I may have done while I was accepting bitcoin from you for cash." Id.

Yet the defendant was not deterred from persisting in his conduct. In a YouTube interview posted on March 16, 2017, the defendant discussed the forfeiture litigation and said, "somebody's dealing in some narcotics, what do I care? I don't think that causes problems—I think that solves problems." Id. In a comment on his blog, Scotese wrote that he had received private responses about the forfeiture action from readers, including "a suggestion that I may need someone to drive my car home for me," which he "assume[d] . . . meant they could imprison me directly from the courthouse," as well as "a suggestion that I get a criminal defense lawyer." Id.

Between approximately April 2020 and November 2022, federal law enforcement conducted an undercover operation in which an undercover agent (the "UC") responded to the defendant's online solicitations and engaged with him in numerous currency exchange transactions. Id. ¶ 9. The transactions were arranged directly with the defendant by text message and covertly recorded telephone calls. Id. The UC sent the defendant quantities of bitcoin to specific bitcoin wallets at the defendant's direction, and the defendant mailed cash (less a fee) to the UC at an address on Long Island. Id.

On or about October 18, 2021, after conducting a transaction with the defendant, the UC contacted the defendant by telephone to request more bitcoin, and this time made express reference to narcotics trafficking—specifically, reference to "Oxy" (i.e., oxycodone, a frequently-abused Schedule II semi-synthetic opioid sold under the brand name Oxycontin). Id. The UC told the defendant, in sum and substance, "One of my runners just dropped off more money . . . if possible, could I do another 5k? I swear to God, he's swallowing more Oxy than he's selling, but if I could do another 5 now. If it's easier for you put it in the same package that's fine, if you want to put it in a separate one, that is fine too, whatever is easier for you." Id. The defendant replied, in sum and substance, "Um, yeah, I can. I'm going to cut it and put another little bag of cash into it so that would be an extra 5k." Id.

During the aforementioned period, the defendant mailed from California, and the UC received on Long Island, a total of approximately $384,387 in United States currency in exchange for bitcoin. Id. ¶ 10.

3

On May 31, 2023, a grand jury sitting in this district returned an indictment charging the defendant with one count of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a) and one count of money laundering in violation of 18 U.S.C. § 1956(a)(3)(B).

The defendant was arrested in California on June 9, 2023 (a Friday), and he was released on bond on June 12, 2023 (the following Monday). At the time of his arrest, the defendant had over $130,000 in cash in his home and vehicle, as well as hundreds of thousands of dollars in coins and precious metals, in addition to hundreds of thousands of dollars' worth of cryptocurrency assets held in online accounts.

The defendant, through counsel, indicated that he would be willing to assist the government in other investigations. Notably, the government obtained warrants to search electronic devices from the defendant's person and home contemporaneously with the defendant's arrest, but some of those devices were encrypted and password-protected, so the government could not access their contents; the defendant voluntarily provided the passwords to facilitate the government's investigation. Although the defendant did not have much information about the illegal activities of his customers and his efforts to cooperate fell short of substantial assistance under § 5K1.1 of the Guidelines, the government acknowledges that it is appropriate for the Court to consider the defendant's "non-5K" cooperation as a relevant factor under 18 U.S.C. § 3553(a) when crafting a sentence. See generally United States v. Fernandez, 443 F.3d 19, 33–34 (2d Cir. 2006).

On March 13, 2024, the defendant appeared before Your Honor and pleaded guilty, pursuant to a plea agreement with the government, to one count of operating an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960(a). In his plea agreement, the defendant consented to the forfeiture of specific cash, precious metals, and cryptocurrency assets traceable to unlawful proceeds of the crime of conviction within the charged time period. PSR ¶ 63. Although the total value of these assets fluctuates widely as a result of the volatility of cryptocurrency markets, it is in excess of $1 million.

II.  Applicable Law

The Supreme Court has explained that a "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted).

Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). Specifically, 18 U.S.C. § 3553(a) requires that, in imposing a sentence, a court shall consider, inter alia:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

>> (B) to afford adequate deterrence to criminal conduct; [and]
>>
>> (C) to protect the public from further crimes of the defendant[.]

18 U.S.C. § 3553(a). The statute also requires the sentencing court to consider the need to provide the defendant educational training, medical care, or other treatment in the most effective manner, the kinds of sentences available, the applicable Guidelines range and policy statements of the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to any victims. Id.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

### III. Analysis

#### A. Guidelines Calculation

The government respectfully submits that the Guidelines calculation in the PSR, which is the same as the government's estimate in the plea agreement, is correct. That calculation is as follows:

|       |                                                                                   |       |
|-------|-----------------------------------------------------------------------------------|-------|
|       | Base Offense Level (U.S.S.G. §§ 2S1.3(a)(2) & 2B1.1(b)(1)(G))                      | 18    |
| Plus: | Knowledge/belief that funds were unlawful proceeds (U.S.S.G. § 2S1.3(b)(1))        | +2    |
| Less: | Zero-point offender (U.S.S.G. § 4C1.1)                                            | -2    |
| Less: | Acceptance of responsibility (U.S.S.G. § 3E1.1(a) and (b))                         | -3    |
|       | Total:                                                                            | 15    |

PSR ¶¶ 14–24. Because the defendant falls within Criminal History Category I, the applicable Guidelines range, corresponding to a total offense level of 15, is 18 to 24 months of imprisonment.

#### B. Argument

The government respectfully submits that a term of imprisonment within the Guidelines range of 18 to 24 months or a modest downward variance is warranted by the Section 3553(a) factors.

First, the defendant's criminal conduct was serious and the nature and circumstances of the offense thus weigh in favor of significant punishment. The defendant may not have known with specificity why particular customers came to him instead of going to established cryptocurrency exchangers who comply with the law—indeed, the defendant may have looked the other way to keep himself deliberately ignorant of such facts. But there is no room to doubt that a substantial number of his customers sought an illicit cryptocurrency

exchange rather than a licit one precisely because they were engaged in other illegal activity—principally buying and selling narcotics—that they sought to conceal. The Court is familiar with the scourge of narcotics trafficking and its awful human toll in this district and beyond. That scourge, and more generally the public interest in thwarting the flow of criminal proceeds that incentivize socially harmful conduct, is the reason anti-money laundering laws exist and why the legal and regulatory framework that governs money transmitting businesses is important. The defendant's flouting of the law undermined that framework by giving criminals a means around it. The defendant enriched himself by facilitating harmful criminal conduct on a large scale—indeed, as he said online, he "never made more money any other way," PSR ¶ 5, and if his customers came to him to further their drug transactions, "what do I care? I don't think that causes problems—I think that solves problems." Id. ¶ 6.

It is significant that the defendant continued to speak this way after the civil forfeiture action effectively put him on notice that the government regarded his conduct as criminal. The defendant advanced a novel legal theory in the civil forfeiture action that his cryptocurrency business was not subject to registration requirements, but he was advised that the government disagreed and was served with FinCEN guidance on the application of the Bank Secrecy Act and FinCEN regulations to virtual currencies. He then chose to settle the litigation at a loss and brazenly persist in the very same conduct as if he had not been warned of the potential consequences. Although the defendant now rightly acknowledges that ignorance of the licensing requirement is not a legal defense,[2] he suggests that his purported ignorance, or his good faith, are mitigating. But that argument, which might have been compelling if he had been charged criminally in 2016, is undermined today by the clarity of the warning he received. There could hardly be a more vivid example of a person being warned of potential criminal liability—indeed, the defendant said himself that even anonymous internet commenters suggested he should get a criminal defense attorney and someone to drive his car home from the courthouse—and simply choosing to ignore it. The Supreme Court long ago observed that there is no unfairness in the requirement "that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." Boyce Motor Lines v. United States, 342 U.S. 337, 340, (1952). Here, the defendant did not merely go perilously close to an uncertain line: he was told exactly where the line was, and he just decided that he disagreed and would refuse to heed it.

The government has no basis to dispute the psychological diagnosis that the defendant filed under seal, and the government does not object to affording it some mitigating

---

[2] See, e.g., United States v. Elfgeeh, 515 F.3d 100, 132 (2d Cir. 2008) ("Under § 1960(a) as amended, however, the government need prove only that the defendant had knowledge that the business was an unlicensed money transmitting business. Accordingly, the government is no longer required to prove that he knew the money-transmitting business was illegal." (internal quotation marks, citations and brackets removed)); United States v. Neumann, No. 21-CR-439 (NSR), 2022 WL 3445820, at *4 (S.D.N.Y. Aug. 17, 2022) ("Section 1960 is a general intent crime for which a defendant is liable if he knowingly operates an unlicensed money transmitting business. It does not require proof that the defendant knew that a State license was required or that the Federal registration requirements . . . applied to the business." (internal quotation marks and citations removed)).

weight. The government respectfully submits, however, that it cannot bear the weight that the defendant places in it. Even if the defendant's decision-making has been, to some extent, encumbered, he is nevertheless—as he acknowledges—responsible for his own decisions. And when he was plainly warned that his conduct could expose him to criminal sanctions, he could have and should have altered his conduct to avoid that consequence, regardless of whether he could or would agree with the law (or the prevailing interpretation of the law) that he now stands convicted of violating. He chose not to do so. That act was volitional. It reflects a willful disregard of the law, and it justifies punishment.

On the other side of the scale, the government acknowledges the defendant's willingness to assist the government in investigations of others and credits him for his good faith offering of assistance to access his password-protected devices in furtherance of the government's investigations. These efforts, although short of substantial assistance under § 5K1.1, reflect acceptance of responsibility and attempts to take corrective action, and they are rightfully considered mitigating at sentencing. Additionally, the defendant has agreed to forfeit a very substantial quantity of assets as traceable to his criminal conduct, which is further reflective of acceptance of responsibility.

Accordingly, in light of all of the above considerations, the government respectfully submits that the balance of the § 3553(a) factors militates in favor of a custodial sentence and that a sentence within the Guidelines range of 18 to 24 months in custody or a modest downward variance would be reasonable.

IV. Conclusion

For the foregoing reasons, the government respectfully submits that a Guidelines sentence of 18 to 24 months' imprisonment or a modest downward variance to reflect the mitigating factors discussed above would be appropriate in this case.

Respectfully submitted,

BREON PEACE
United States Attorney

By:  /s/
Robert M. Pollack
Assistant U.S. Attorney
(718) 254-6232

cc: Clerk of the Court (JMA) (by ECF)
Counsel of record (by ECF and E-mail)